J-S47034-20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT |
| | : | OF PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| GERARDO LUIS TORRES | : | |
| | : | |
| Appellant | : | No. 530 MDA 2020 |

Appeal from the Judgment of Sentence entered February 14, 2020
in the Court of Common Pleas of Berks County
Criminal Division at No: CP-06-CR-0005259-2017

BEFORE:    STABILE, J., NICHOLS, J. and STRASSBURGER, J.*

MEMORANDUM BY STABILE, J.:                    **FILED JUNE 25, 2021**

Appellant, Gerardo Luis Torres, appeals from the February 14, 2020 judgment of sentence of seven to fifteen years of incarceration, followed by five years of probation, after a jury convicted him of involuntary deviate sexual intercourse, aggravated indecent assault, endangering welfare of children, and indecent assault.[1]  Upon review, we affirm.

The trial court provided the following background.

> In 2004, Appellant… entered into his daughter, B.L.'s room, who was sixteen at the time, and proceeded to sexually assault her. Though a complaint was initially filed, the ensuing investigation did not proceed to any prosecutorial action.  In 2016, during an interview with CYS[2] in an unrelated incident [involving B.L.'s

---

[1]  18 Pa.C.S.A. §§ 3123(a)(1), 3125(a)(1), 4304(a), and 3126(a)(1), respectively.

[2]  "CYS" refers to the Berks County Children and Youth Services.

*Retired Senior Judge assigned to the Superior Court.

oldest child], B.L. recounted the allegation of sexual assault. This time, the matter was again investigated and [the above-mentioned[3]] charges were thereafter brought against Appellant.

Trial Court Opinion, 5/29/20, at 1.

Appellant proceeded to a jury trial from November 6-8, 2020. The trial court thoroughly detailed the testimony and evidence presented during the three-day jury trial as follows.

> [T]he Commonwealth first called B.L. as a witness. B.L. lived with both Appellant and her mother, Bridget Torres, until she was three, when Appellant moved out of the house. Appellant moved back in with the family when B.L. was thirteen.
>
> B.L. testified that upon Appellant's return to the household, when she was approximately thirteen years old, Appellant would often make inappropriate comments about B.L.'s body. According to B.L. Appellant would also brag about the size of his own genitals. Appellant would ask B.L. to kiss him on the lips and, sometimes, when B.L. was going to bed, Appellant would lean over, kiss B.L. on the neck and place his tongue in her ear. On multiple occasions, when B.L. would return from seeing her boyfriend, Appellant would question B.L. if she had sex and then asked B.L. if Appellant could smell her. Appellant would proceed to smell B.L. between her legs.
>
> When B.L. was sixteen years old, Appellant entered B.L.'s bedroom as she was going to bed and sat down on her bed. Appellant then told B.L. that he wanted to "taste" her. Appellant then proceeded to put his head under the bedcovers, between B.L.'s legs, [and] pulled B.L.'s underwear to the side. B.L. then described that Appellant "grabbed me and had [my] vagina open and licked me top to bottom." Afterward, as Appellant left the room, B.L. testified that Appellant told her that "I want to do it again." [Appellant then turned around, returned to her bed, licked her vagina again, and finally left the room.]

---

[3] Appellant also was charged with one count of corruption of minors.

B.L. testified that she told her boyfriend at the time, Anthony, about the incident a few days after it occurred. B.L. also told her best friend, Lisa, about what happened, but did not provide details of the incident. Around the same time, B.L. also expressed to Anthony that she wanted to become pregnant so that she could be emancipated from her parents.

In 2004, an argument occurred between Appellant and Bridget regarding a cell phone that Appellant had provided to B.L., but which Bridget did not approve. After Appellant called B.L. to inform her that [Bridget] found the phone, B.L. and Anthony arrived at the house and the family had a meeting. During that meeting, Anthony told Bridget that Appellant had been smoking marijuana with B.L. and urged B.L. to tell [Bridget] about the sexual assault. B.L. testified that she told Bridget about the sexual assault and [Bridget] kicked Appellant out of the house.

Approximately two hours later, Bridget … took B.L. to the courthouse to report the incident. Although she could not remember with whom she spoke, B.L. testified that she was interviewed that night by a member of law enforcement. Roughly one month later, B.L. received a call from law enforcement asking if she wanted to press charges, to which she replied that she did not want to press charges if she would have to see Appellant in court. B.L. did not receive any further communication regarding the sexual assault until [CYS questioned her about it again in 2016.]

In October of 2004, B.L. found out that she was pregnant. At that time, B.L. moved out of Bridget's house, married Anthony, and moved in with Anthony's family. Appellant attended the wedding, at which B.L. stated that she and Appellant hugged and cried but did not say anything. One night, B.L. returned to [Bridget's] house to ask her … for help and saw Appellant living back at the house. Thereafter, Appellant and Bridget moved to Boston for Bridget's job.

Ultimately, B.L. and Anthony had two daughters together, but eventually separated in 2010. Aft[er] the separation, B.L. moved into a home in Reading and their two daughters stayed with Anthony in New Jersey. However, that same year, Anthony contacted B.L. for help, requesting that B.L. take their daughters and B.L. agreed. When B.L. arrived home with her daughters,

[CYS] became involved and B.L. had the choice of placing the children into foster care or with a family member. B.L. asked Bridget to take care of her daughters, thinking that the process to get the children back with her would be short. At the time, Appellant was residing with Bridget, but B.L. testified that she believed [Bridget] "would be on high alert" and that she "would watch these little girls and make sure nothing would happen to anybody else again." B.L. also testified that she felt that she had nobody else that could help. In 2011, B.L. gave custodial guardianship to Bridget and Appellant, who were living in the Boston area. The guardianship ended in 2013 and B.L. regained custody of her daughters.

In 2016, an unrelated incident occurred between another family member and B.L.[']s oldest daughter. Upon becoming aware of the situation, B.L. contacted CYS and law enforcement. During the interview with the CYS caseworker, the worker questioned B.L. regarding the earlier complaint about Appellant. B.L. testified that the caseworker initiated the paperwork for the claim and, about a week later, Detective Thomas Weaver came to B.L.'s home and an investigation [into the 2004 incident] ensued.

As part of the investigation, B.L. placed a telephone call to Appellant while sitting in Detective Weaver's vehicle. One of the phone calls was recorded and played to the jury during the trial.

On cross-examination, B.L. admitted that she knew Appellant would be home with her children, though she believed that her children would be in school during the day. B.L. also understood that granting custodial guardianship to [Bridget] and Appellant would provide them with broad authority in the care of her children. Moreover, B.L. confirmed that CYS approved of the guardianship.

When questioned about whether she had asked Appellant to attend her wedding, B.L. stated that she did not remember inviting him. Nevertheless, B.L. admitted that she asked Appellant to giver her away at her wedding at the magistrate's office.

Defense counsel then referenced the transcript from the preliminary hearing, during which B.L. testified that Appellant

- 4 -

initially asked if B.L., "wanted to taste" him, but B.L. denied that Appellant ever asked her to touch or taste him and denied testifying to such. Likewise, at the preliminary hearing, when asked whether she told anyone else about the sexual assault incident, B.L. made no reference to telling her friend Lisa about the incident.

Detective Thomas Weaver, a criminal investigator with the Berks County District Attorney's Office, testified that he was initially assigned the investigation of the sexual assault in 2016 after a report of child abuse was received in the office. Upon receiving the assignment, Detective Weaver first performed a search of the system and found that B.L. had made the original allegation in 2004, and that the investigation at that time, which was handled by another detective, was closed. After initially interviewing B.L., Detective Weaver contacted her again to engage in the … recorded telephone call, which was placed and recorded on January 19, 2017.

Detective Weaver then contacted … Anthony, but was unsuccessful. Detective Weaver also contacted Patrick Boyle, Anthony's stepfather, as well as B.L.'s friend Lisa Bettenhausen.

Detective Weaver testified that he was present at the preliminary hearing and that his recollection of B.L.'s testimony was consistent with her testimony at trial. Furthermore, Detective Weaver indicated that no rape kit collection was ever performed during the first investigation in 2004, or pursuant to the reopened investigation.

Patrick Boyle testified that B.L. was his stepson… Anthony's wife and that he has known B.L. for approximately fifteen years. [Patrick] indicated that B.L. told him about the sexual assault at some point between September and November of 2004, though he didn't remember the exact date. [Patrick] further confirmed that the first time he spoke with anyone from law enforcement regarding what B.L. told him was approximately four weeks prior to trial.

The defense called John Monick, who testified that he was the court reporter attending the preliminary hearing in this matter before the magisterial district on November 2, 2017[,] and that he subsequently produced a transcript of the proceedings. Mr.

Monick then read from the transcript of the preliminary hearing wherein B.L. testified that … Appellant asked her if she wanted to "taste" him. Mr. Monick also recited the portion of the preliminary hearing transcript in which B.L. only referred to telling Anthony and [Bridget] about the sexual assault. Mr. Monick testified that in his forty-year career as a court reporter, he had only previously been called to court once to testify regarding transcripts that he has produced, but not as to the truthfulness of his transcripts. During cross-examination, the Commonwealth asked Mr. Monick to recite a portion of the transcript in which defense counsel, questioning B.L. at the preliminary hearing, seemed to acknowledge that Appellant had asked to "taste" B.L. and ignored the discrepancy in the earlier answer.

The defense next called CYS caseworker, William Clemmons III, who testified that in 2016, he engaged in an email conversation with Bridget, during which he informed [Bridget] that he was no longer handling B.L.'s case. Mr. Clemmons advised Bridget that another caseworker, Leah Knoll, whom Mr. Clemmons described as "tough as nails," would be taking over the case.

The Commonwealth questioned Mr. Clemmons [*sic*] stated that he first met Bridget in 2010 or 2011, and that he has not had contact with Bridget since the 2016 email. Mr. Clemmons discontinued his involvement in the case investigation in 2015, when the case was reassigned to the new caseworker.

The Commonwealth then question[ed] Mr. Clemmons, and he admitted as such, that Bridget sent him cookies and photographs of the children. At this point in the trial, defense counsel requested a sidebar, and at the sidebar sought to rebut the Commonwealth's cross-examination by pursuing a line of questioning regarding allegations of sexual misconduct that B.L. claimed against Mr. Clemmons. The Commonwealth argued that the line of questioning would be irrelevant. Th[e trial] court ultimately ruled against allowing questioning about alleged sexual misconduct claimed by B.L. against Mr. Clemmons.

Bridget … testified that she and Appellant were first married in May of 1987 and B.L. was born in December of that year. In 1991, Appellant and Bridget divorced, and Appellant moved out of the house. However, around 2002, when B.L. was about

fifteen years old, Bridget asked Appellant to move back into the house. At the time, Bridget was employed full-time and continued to work full-time [at a bank] for seventeen years. In 2004, Bridget's working hours increased and she regularly traveled to the New England area. While Bridget was at work, Appellant would be home with B.L.

In or around 2003, Bridget became aware that B.L. began dating Anthony, even though Bridget had prohibited the relationship. Bridget testified that in August of 2004, Anthony, who was not permitted to be in Bridget's house, entered the home. An argument ensued in which Bridget told Anthony to leave the house and reiterated the prohibition on the relationship between Anthony and B.L. When Bridget threatened to inform Appellant about the continued relationship, Anthony told Bridget that Appellant had been abusing B.L. Bridget immediately told Anthony to go home and proceeded to comfort B.L.

When Appellant, who had been at work, arrived back at the house, Bridget told him to leave. Bridget called her therapist to determine the proper course of action, and then called the police and CYS. Bridget took B.L. to the courthouse, where she obtained a temporary protection from abuse order.

After that night, Bridget described B.L. as becoming more rebellious and repeatedly talking about being emancipated. Bridget and B.L. argued about allowing Anthony to move into the house, after which, B.L. became angry and proceeded to move in with Anthony's family. In September of 2004, B.L. returned to the house and informed Bridget that she was pregnant. Bridget, who had been in contact with CYS regarding [t]he entire situation, called CYS again, informing [t]he agency that B.L. was pregnant. A representative from CYS arrived and took B.L. to a doctor's appointment, after which Bridget, the CYS worker, and B.L. sat down to discuss B.L.'s options. B.L. decided to marry Anthony. Bridget testified that she and B.L. had talked about inviting Appellant to B.L.'s wedding, and that B.L. and Appellant had talked about it. Appellant attended the wedding and gave B.L. away at the we[d]ding.

In late October or early November of 2004, Appellant moved back into the house. B.L. and Anthony moved into a house nearby and Appellant helped B.L. move into the new place.

- 7 -

Bridget disputed B.L.['s] testimony that the relationship was strained at that point, noting that they regularly visited each other's homes, including Appellant. Bridget and Appellant moved to the Boston area in 2008, but Bridget contends that the relationship between herself, Appellant, and B.L. continued to be amicable.

In January of 2011, B.L. contacted Appellant, after which, Bridget took time off from her job and she and Appellant traveled to Pennsylvania. Once in Pennsylvania, Appellant and Bridget met with B.L., who then asked Appellant and Bridget to take B.L.'s daughters with them. In February of 2011, Appellant and Bridget, with the consent of B.L., took permanent guardianship of B.L.'s two daughters. As part of the process, both Appellant and Bridget needed to be approved for guardianship, which they were. B.L.'s daughters stayed with Bridget and Appellant for almost two and a half years, until July of 2013. While B.L.'s daughters were in the custody of Bridget and Appellant, Bridget was the sole worker [in the] home and therefore, Appellant was often entrusted with the care of the girls. Bridget testified that B.L. was in contact with Appellant and herself and that B.L. knew the conditions that existed while the girls were in their custody.

After B.L.'s daughters returned to live with her, the relationship between Bridget, Appellant and B.L. and her family continued. In 2016, when Bridget and Appellant decided to remarry, Bridget included B.L. in discussions and planning.

In late August of 2016, a disagreement occurred between B.L.[,] B.L.'s [second] husband, Bridget, and Appellant. Bridget and Appellant drove down from the Boston area, to sit down with B.L. and her husband for a meeting. However, B.L. became upset and the relationship between B.L. and Bridget and Appellant began to deteriorate. From that point on, Bridget and Appellant did not have contact with B.L. or her daughters.

Bridget testified that she first came into contact with Mr. Clemmons from CYS while she and Appellant maintained guardianship of B.L.'s daughters, and Bridget maintained contact with Mr. Clemmons. As a token of their appreciation for Mr. Clemmons['] work to have B.L.'s daughters returned to her, Bridget would often send cookies and holiday cards to Mr.

Clemmons. In September of 2016, Bridget filed a report with CYS regarding B.L. Soon thereafter, Bridget received a phone call from B.L., who was furious, and the conversation ended with B.L. expressing that she did not want to see Bridget again or be part of her life. Since that time, Bridget has had very little contact with B.L.

Appellant next testified on his own behalf. Appellant denied sexually assaulting B.L. Appellant denied making sexually inappropriate comments to B.L. or asking to smell B.L.

On rebuttal, the Commonwealth called Lisa Bettenhausen to testify. Ms. Bettenhausen testified that in the fall of 2004, B.L. called and asked Ms. Bettenhausen to pick her up. At that time, B.L. told Ms. Bettenhausen that Appellant performed oral sex on B.L. On cross-examination, Ms. Bettenhausen admitted that she was still friends with B.L.

*Id.* at 1–8 (citations and brackets in original omitted).[4]

The jury found Appellant guilty as indicated hereinabove. On February 14, 2020, the trial court imposed an aggregate judgment of sentence of seven to fifteen years of incarceration followed by five years of probation. Appellant timely filed a post-sentence motion challenging the weight of the evidence. The trial court held a hearing on March 5, 2020, at the conclusion of which the court denied Appellant's motion.

This timely filed notice of appeal followed. The trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). Appellant

---

[4] At the conclusion of the Commonwealth's case-in-chief, the trial court granted Appellant's motion for a directed verdict of acquittal as to the corruption of minors charge based upon the statute of limitations. N.T., 11/6-8/2019, at 274–75.

filed his concise statement on April 20, 2020. The trial court filed its Rule 1925(a) opinion on May 29, 2020. On appeal, Appellant presents the following questions for our review.

1. Whether the trial court erred in denying the Post Sentence Motion challenging the weight of the evidence where it was clear from the record that the verdict issued was rendered unreliable, tainted, questionable, and contrary to the weight of the evidence by the trial testimony of [B.L.] where her testimony was replete with inconsistencies, lies, half-truths, and utterly without support or proof, and especially unbelievable when measured against the wholly corroborated and consistent testimony of the defense witnesses, all of which was entirely supported by further independent testimony and unassailable facts?

2. Whether the trial court erred in denying defense counsel's line of questioning of William Clemmons, III, regarding an accusation that [B.L.] made against Mr. Clemmons of inappropriate sexual behavior toward her during the course of his contact with the alleged victim through Children and Youth Services while the agency was investigating the alleged victim, where such testimony would have served to challenge the credibility of the alleged victim in a case where credibility was the lynchpin of the Commonwealth's prosecution as no physical evidence existed?

Appellant's Brief at 6 (trial court and suggested answers omitted).

Appellant first agues the verdict was against the weight of the evidence. His challenge is grounded in what he deems to be the "unbelievable" testimony of B.L., which he claims was fabricated, uncorroborated, and inconsistent with her preliminary hearing testimony (regarding who she told about the incident and what Appellant said) and her actions following the incident (regarding her inviting Appellant to her

wedding to give her away and agreeing to Appellant and Bridget's guardianship of her daughters). Appellant's Brief at 15–30.

Our Supreme Court has instructed:

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citing *Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000)).

The trial court held a hearing to allow Appellant and the Commonwealth to present arguments on Appellant's weight claim. At the conclusion of the hearing, the trial court denied Appellant's motion, noting that the jury "must have concluded that [Appellant's] testimony was untrue" and that the court was "in no position to tell them that they were wrong." N.T., 3/5/20, at 12. The trial court elaborated in its Rule 1925(a) opinion:

> In reaching its verdict, the jury obviously weighed the testimony of the various witnesses from the trial and credited B.L.'s

- 11 -

testimony as to the sexual assault. The jury did so after having heard defense counsel's vigorous cross-examination of the Commonwealth's witnesses and upon the testimony in favor of Appellant. Likewise, the jury heard testimony and saw evidence that guardianship of B.L.'s two daughters was granted to Appellant and Bridget. The inconsistencies in who B.L. told of the sexual assault and how such was presented during the preliminary hearing were also presented thoroughly to the jury by defense counsel and through testimony of the court reporter.

While [the trial] court acknowledges that there were clear conflicts in the testimony presented and that certainly, one might find inconsistencies both in the testimony and in what some may surmise to be contradictory to human behavior. However, we don't find the conflicts or inconsistencies to be "so unreliable or contradictory as to make any verdict based thereon obviously the result of conjecture and not reason." *Commonwealth v. Farquharson*, 354 A.2d 454, 550 (Pa. 1970). Th[e trial]court, though under no obligation to review the facts in the light most favorable to the verdict winner, may not grant a new trial "because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion." *Thompson v. City of Philadelphia*, 493 A.2d 669, 672 (Pa. 1985). As such, we find no reason to disturb the verdict of the jury as it was not so contrary to the evidence that it shocks the conscience of th[e trial] court.

Trial Court Opinion, 5/29/20, at 11.

Having considered the trial court's findings and reasoning, we conclude that it acted within its discretion by rejecting Appellant's challenge to the weight of the evidence. Appellant's first issue fails.

Appellant also contends the trial court erred in denying Appellant's request to question Mr. Clemmons about B.L.'s accusation against Mr. Clemmons of inappropriate sexual behavior, arguing that such testimony

was admissible to challenge B.L.'s credibility. Appellant's Brief at 31. This issue involves a challenge to an evidentiary ruling. It is settled:

> [a]dmission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

***Commonwealth v. Tyson***, 119 A.3d 353, 357–58 (Pa. Super. 2015) (*en banc*) (internal citations omitted). Moreover, an appellant bears a "heavy burden" to show that the trial court has abused its discretion. ***Commonwealth v. Christine***, 125 A.3d 394, 398 (Pa. 2015).

Appellant argues on appeal that the trial court erred in denying his request to question Mr. Clemmons about B.L.'s allegation that he engaged in sexually inappropriate behavior towards her. By way of background, during cross-examination, the Commonwealth questioned Mr. Clemmons about his receiving cookies and pictures of B.L.'s children from Bridget as a way to demonstrate that Bridget had "him in her pocket." N.T., 11/6-8/19, at 309, 312. Based on this, Appellant sought to question Mr. Clemmons about B.L.'s allegation against Mr. Clemmons of sexually inappropriate behavior, which Appellant asserts "was never proven[,]" to explain that "that's the only reason the mom sent these kids['] pictures. She[] feels like a piece of crap to this guy[.]" ***Id.*** at 310. Appellant's counsel further argued:

> That's the allegation[, that Bridget had him in her pocket]. I have to be able to respond. … The only reason she is doing that, and he is participating, because [B.L.] accused him of inappropriate contact…. [The Commonwealth] is asking because she's trying to show a bias for him towards my client, and there was no bias. My client is horrified that her daughter made another allegation against somebody else that isn't true.[5] That's why. So I have to be able to get into the bias.

*Id.* The trial court held that it was "not going to let this whole business evolve into a separate case in effect raising issues that have not a thing to do with the allegations that are in front of [the court.]" *Id.* at 314.

Pa.R.E. 103(a) provides:

> (a) A party may claim error in a ruling to admit or exclude evidence only:
>
>> (1) if the ruling admits evidence, a party, on the record:
>>
>>> (A) makes a timely objection ...; and
>>>
>>> (B) states the specific ground, unless it was apparent from the context; or
>>
>> (2) if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context.

Pa.R.E. 103(a). Rule 608 provides in pertinent part:

> A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked. Opinion testimony about the

---

[5] It is unclear from the transcript whether Appellant's counsel was referring to Appellant, who was his client, to Bridget, or to Appellant and Bridget.

- 14 -

witness's character for truthfulness or untruthfulness is not admissible.

Pa.R.E. 608(a). Moreover, "the character of a witness for truthfulness may not be attacked or supported by cross-examination or extrinsic evidence concerning specific instances of the witness's conduct[.]" Pa.R.E. 608(b)(1).

In its Rule 1925(a) opinion, the trial court explained:

In the instant matter, Appellant sought to introduce evidence that the victim, B.L., had made a claim of inappropriate behavior against Mr. Clemmons that was alleged to have occurred subsequent to the sexual assault complained of in this action. Appellant argues that such evidence was necessary to challenge the credibility of B.L. Clearly, the testimony defense counsel sought to introduce was of a specific instance of the victim's behavior, though occurring subsequent to the crime alleged, but prior to trial, and, in accordance with the case law in this Commonwealth, [the trial court] find[s] that such cannot be introduced pursuant to Pa.R.E. 608 and th[e] court properly excluded such evidence in the trial of this matter.

Trial Court Opinion, 5/29/20, at 14.

Based on our review of the record, we find no abuse of discretion on the part of the trial court. Therefore, Appellant is not entitled to relief on his second issue.

Judgment of sentence affirmed.

Judge Strassburger did not participate in the consideration or decision of this case.

- 15 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/25/2021